Date signed September 25, 2013



ROBERT A. GORDON
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

|  |  |  |
|---|---|---|
| In re: | * | |
| Evany Osayomwanbor Ogbebor | * | Case No. 08-24898-RAG |
| | | Chapter 7 |
| Debtor | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

|  |  |  |
|---|---|---|
| Kouassi Mathias Allegra | * | |
| Aurelie Measseu-Allegra | | |
| | * | |
| Plaintiffs | | |
| | * | |
| v. | | Adversary No. 09-00324-RAG |
| | * | |
| Evany Osayomwanbor Ogbebor | | |
| | * | |
| Defendant | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION IN SUPPORT OF JUDGMENT
GRANTING IN PART AND DENYING IN PART PLAINTIFF'S
AMENDED COMPLAINT OBJECTING TO DISCHARGE
OF THE DEBTOR AND/OR TO DETERMINE
<u>DISCHARGEABILITY OF PLAINTIFFS' CLAIMS</u>**

1

## I.    Preliminary Statement

Defendant, Mr. Ogbebor, characterizes this dispute as one concerning a failed, start-up title company, whose outcome leaves him with no responsibility for the Plaintiffs' – Mr. Allegra and Ms. Measseu-Allegra's – significant losses.  The Court sees it differently.  This is so because the evidence convincingly establishes that the Defendant took the lead in fraudulently bilking the Plaintiffs out of every penny they intended to invest in the ethereal limited liability company, Kingdom Title (Kingdom).  The resulting debt will therefore be excepted from the Defendant's discharge. Nevertheless, as despicable as the initial fraud was, the circumstances surrounding Ms. Measseu-Allegra's subsequent agreement to guarantee Kingdom's purchase of an office copy machine, after being told that its principals' personal credit was too weak to support the purchase, cannot underpin a finding of either a misrepresentation by the Defendant or justifiable reliance by the Plaintiff, or a violation of any fiduciary obligation, and hence that alleged debt shall be discharged.  Finally, Defendant will escape with his general discharge as the evidence does not demonstrate that the omissions from his Schedules were either fraudulently made or material.

## II.    Procedural History

On November 11, 2008 (Petition Date), Evany Ogbebor (Defendant) filed his Voluntary Petition (Petition) under Chapter 13 of the Bankruptcy Code.[1]  On February 19, 2009, an Order Upon Conversion of Chapter 13 Case Following the Preconfirmation Filing of a Notice of Conversion by Debtor (Conversion Order) (Dkt. No. 53) was entered as a result of Mr. Ogbebor's February 12, 2009 filing of a Notice of Voluntary Conversion to Chapter 7 (Conversion Notice) (Dkt. No. 45).  The Conversion Order confirmed the conversion of the case

---

[1] Unless otherwise noted, all statutory citations are to the Bankruptcy Code (Code), found at Title 11 of the United States Code.

to Chapter 7 pursuant to 11 U.S.C. § 1307(a) as of the date of entry of the Conversion Notice.

On May 26, 2009, Kouassi Mathias Allegra and Aurelie Measseu-Allegra (Plaintiffs)

commenced this Adversary Proceeding by filing a timely Complaint Objecting to Discharge of

the Debtor.  On May 27, 2009, Plaintiffs filed their Amended Complaint Objecting to Discharge

of Debtor and to Determine Dischargeability of Plaintiffs' Claims (Dkt. No. 3) (Complaint).

The Complaint alleged that debts owed the Plaintiffs should be declared non-

dischargeable pursuant to Sections 523(a)(2) and (a)(4) and that Defendant should be denied his

discharge under 11 U.S.C. 727(a)(12)[2].  The claims arise from allegations that the Defendant, as

President of Kingdom, (a) fraudulently induced Plaintiffs to invest $45,000 in that entity, (b)

further fraudulently induced Ms. Allegra to guarantee a business lease on which Kingdom

immediately defaulted and (c) fraudulently omitted information from his Statement of Financial

Affairs (SOFA) and Schedules.  The Defendant filed his Answer (Dkt. No. 9) on August 24,

2009 and denied the material allegations.  The trial began on November 29, 2010, was continued

to November 30, 2010 and final argument was held on February 28, 2011.  The parties were

afforded sixty days after that date to submit supplemental memoranda and thereafter, the matter

was taken under advisement.[3]

### III.    Factual Background

Only two witnesses testified: Mr. Ogbebor and Ms. Allegra.  Defendant was called as an

adverse witness to open Plaintiffs' case and Ms. Allegra was called thereafter.  The Defendant

---

[2] Section 727(a)(12) has no possible application to this case.  Nevertheless, Plaintiffs' evidence unfolded as if a claim for relief pursuant to Section 727(a) (4)(A) had been alleged and the proof will be analyzed under the standards applicable to that provision.

[3] The Court has apologized to the parties for the delay between the filing of the final papers and this decision. However, the apology, and the fact that the reasons for it were both serious and beyond the Court's control, bears repeating here.

did not call any witnesses, choosing instead to limit his case to cross-examination and the submission of documents. With that foundation, the Court is able to find the following facts.

The Allegras were introduced to the Defendant by Patrick Tzeuton who, at the time, was a licensed attorney. Mr. Tzeuton represented the Allegras with respect to their immigration from the Republic of Cameroon to the United States.[4] In early June 2007, the Allegras hosted Mr. Tzeuton at their home and told him about their interest in starting a title company. He in turn told them about his associates' ongoing efforts to do the same and suggested that they might want to meet with them to consider whether investment in the burgeoning project would be a good idea.

What Mr. Tzeuton did not tell the Plaintiffs was that at some point prior to May 2007, he, the Defendant, and others had already sought to open a branch of a pre-existing title company named Trinity Title Services, LLC (Trinity) but that effort had floundered due to the rejection of their licensing application[5] because of inadequate personal credit ratings. Undeterred, on May 21, 2007, the Defendant, Mr. Tzeuton, Bechem Thomas Nkafu (Mr. Nkafu), and Clara Tchoundjo Tchuipet (Ms. Tchuipet) formed Kingdom. The Defendant asserted that Kingdom was to operate as a title company (and that was the understanding gained by the Plaintiffs) although no license was ever obtained and there was no evidence of Kingdom ever doing any

---

[4] Mr. Tzeuton also hails from the Republic of Cameroon. His background helped to draw the Plaintiffs into the web of fraud, particularly so in light of his ability to speak both French and English. Ms. Allegra testified that at the time of the events in question, the Plaintiffs were not very conversant in English. By the time the trial was held, Mr. Tzeuton had been convicted of a crime of fraud in connection with his immigration practice and, while preparing this Opinion, the Court *sua sponte* took judicial notice of his resulting disbarment. *Committee on Professional Standards v. Tzeuton* (*In re Tzeuton*), No. D-38-09 (N.Y. App. Div., Oct. 1, 2009)

[5] Throughout their testimony and filings, both the Allegras and Mr. Ogbebor referred to a 'license' necessary for Kingdom to become a title company. While there are state licensing requirements for title insurance producers under Md. Ins. Code §10-101 *et seq.*, it is unclear if this is the "license" referenced. The Maryland Insurance Administration issues state title insurance producers' licenses, but Mr. Ogbebor referred to applying to companies and underwriters for a license. The Parties may be referring to a search to find a title insurance company willing to allow Kingdom to act as its title agent but the evidence never clarified the point.

legitimate business as a going concern. Nevertheless, the Defendant was Kingdom's President from its founding until its informal dissolution at the end of 2008.

At Mr. Tzeuton's invitation, the Allegras (in the company of other prospective investors) attended a meeting on June 7, 2007 (June 7th Meeting) in the office space that Kingdom allegedly rented.[6] Per Ms. Allegra's testimony, the Defendant was in charge of the meeting and began it with a moment of prayer to emphasize the Christian foundation that he and his associates had in mind for Kingdom and to confirm the high standard of morality that would permeate its affairs. In that vein, Mr. Ogbebor also gave express assurances to the prospective investors that Kingdom's business dealings would be completely transparent and that all relevant information would be shared. With prayer and affirmation as prelude, Mr. Ogbebor then made the following representations, according to Ms. Allegra:

> [The Defendant] said, the share to be a part of the business (Kingdom) is 5,000 per share. And we have to pay the share before July 1st weekend because the license is already, almost approved. So what they need is like they need some, how do you say, security bond. The title insurance producer was asking to have a security bond for the company for them to have the approval of the company. So that's why we were selling those shares to make sure we have enough money.

(Trial Tr. 151, Nov. 29, 2010).

---

[6] No lease, or any other substantial corporate business records, (other than bank statements) were offered into evidence. Ms. Allegra testified that the June 7th Meeting was her (and her husband's) first meeting with the Defendant. By contrast, Mr. Ogbebor testified that the Allegras were also involved with Trinity (prior to the June 7th Meeting) but he was uncertain about dates and offered no evidence of their involvement beyond his own testimony. Two "Certificates of Shares" admitted into evidence reflect the Trinity name being used as late as October 2007. See Plaintiff's Exhibit 6. For reasons to be discussed below, the Court believes Ms. Allegra's version of events including the fact that they first met the Defendant at the June 7th Meeting.

To clarify, it was Ms. Allegra's understanding that the Defendant and his cohorts were offering ownership interests in Kingdom at a cost of $5,000 per "share".[7]  In this context the phrase "security bond" – as communicated by the Defendant and understood by Ms. Allegra – meant that any money invested to purchase shares by the attendees of the June 7th Meeting would remain in escrow to prove to licensing authorities that Kingdom had ample reserves.  Ms. Allegra justifiably understood from the Defendant's words that this meant the investments would be held sacrosanct for that sole purpose and would not be used for anything else.  The Defendant's "Christian Values" sales pitch convinced the Plaintiffs to trust his word without further assurances. They did not inquire about Kingdom's general financial fitness nor did they request documents relevant to Kingdom's financial affairs.  When the presentation was over, the Defendant led a tour of the office space.

The Court finds that Mr. Ogbebor made the following representations at the June 7th Meeting: 1) that the Allegras would be purchasing a membership interest in Kingdom at a cost of $5,000 per share, 2) that Kingdom's license to do business as a title company was close to being approved, 3) that all that was necessary for Kingdom to gain license approval was proof of substantial cash in escrow, 4) that the money invested would be held in escrow to establish Kingdom's financial stability and would not be used for any other purpose and 5) that Kingdom would be managed transparently with all of its important dealings communicated to its investors. These representations convinced the Plaintiffs to invest.

On June 22, 2007, Ms. Allegra wrote two checks payable to Kingdom – one for $15,000 and the other for $10,000 – to purchase five shares.  About ten days later, Mr. Tzeuton made a second request for funds to Ms. Allegra.  He told her that although he and his colleagues thought

---

[7] Ms. Allegra and her Counsel repeatedly referred to the Allegras' purchase of "shares" in Kingdom and used the word to denote a membership interest in the limited liability company.  For the sake of consistency, the Court will use the same word throughout this Opinion.

license approval would have been secured by July 1st, they had since learned that a larger escrow

balance was needed.  On July 3, 2007, Ms. Allegra wired $20,000 more to Kingdom.  She

explained why the additional payment was made:

> Because they call me, it was Patrick who called me that day and
> said we have a problem.  The account does not have enough
> money for the approval.  So the approval is supposed to be on July
> 1st and now it was after July 1st.  From what I learned after, long
> time after, it was, they were denied.  But I was not aware of that.
> They did not tell me they were denied.
>
> Patrick told me because the money was not enough, we need to
> pay more shares to be able to have the approval from the
> underwriter.  So that's why on July 3rd I wire transferred 20,000
> again.

(Trial Tr. 153, Nov. 29, 2010).

If, by the second request, the account 'did not have enough money', that was not because

an independent third party had judged the existing funding insufficient to meet an objective

underwriting standard.  The real reason more money was needed was because the Defendant and

his cohorts were bent upon using it as their own personal expense account and planned on

carving it up like a holiday goose as quickly as circumstances allowed.

On May 25, 2007, four bank accounts ─ escrow, savings, payroll and operating ─ were

opened at Bank of America in the name of Kingdom.  Mr. Ogbebor and his accomplices were

signatories on all four and each was funded with only $25.  The "payroll" and "escrow" accounts

remained largely inactive with only small deposits of $25 made to cover account fees.

The evidentiary paper trail convincingly establishes that the Allegras' initial investment

of $25,000 was deposited into the savings account the day the checks were written.  *See* Pl.'s Ex.

11.  At the time the account held only $25 and except for $2,500 transferred from Kingdom's

operating account and quickly transferred back, no additional deposits were made.  *Id*.  Instead,

the savings account acted as a holding account for the operating account to which it was linked. In July 2007, a total of $20,000 was transferred from the savings account to the operating account. *Id.* In August, another $4,271.00 went the same way. *Id.*

The operating account was thus the cash cow of Mr. Ogbebor and his confederates and almost all withdrawals were made from it. Prior to June 22, 2007, the operating account held only $25. *See* Pl.'s Ex. 13. From June 22nd to September 27th 2007 (when the last deposit was made), however, a total of $86,013.04 was deposited into the operating account. *Id.* Yet, by September's end the closing balance totaled only $48.11. *Id.* In short, only three months after the June 7th Meeting, the Defendant and his accomplices blazed through nearly $86,000.

Much of the money went directly to the individual officers as alleged expense reimbursements. Yet, the Allegras were never given a true accounting of either the underlying expenses or the claimed reimbursements. All of their reasonable requests for information were either ignored or stonewalled. Another $12,807.95 went to purchase, deliver and install office furniture, computers and a telephone system. It appears, however, that personal property ultimately ended up in the possession of Ms. Tchuipet.[8]

---

[8] The Court was left with the impression that at least one or more "businesses" were being run out of the office space and it is difficult to determine conclusively where the personal property actually ended up. However, it is certain that Kingdom never made any productive use of it.

Even more startling, almost half of the money was used to fund so-called 'loans' to each of the four officers as follows:

| Check Date | Amount | Recipient |
|---|---|---|
| 7/06/2007 | $5,000 | Evany Ogbebor |
| 7/09/2007 | $5,000 | Clara Tchuipet (on behalf of Patrick Tzeuton) |
| 7/09/2007 | $10,000 | Clara Tchuipet |
| 7/12/2007 | $5,000 | Patrick Tzeuton |
| 7/12/2007 | $9,000 | Bechem Thomas Nkafu |
| 7/12/2007 | $1,360 | Clara Tchuipet (on behalf of Evany Ogbebor) |
| 7/12/2007 | $3,640 | Evany Ogbebor. |
| **Total** | **$39,000** | |

Pl.'s Ex. 13.

Mr. Ogbebor did not dispute that the forgoing payments had been made and while he testified that the recipients intended to repay the money he also admitted that none of it had been. Nor had he done anything as President to cause Kingdom to try and recover the money.

After the Plaintiffs made their $45,000 payment, the officers decided to rent a copier from TimePayment Corp. (TimePayment). The application was rejected due to their poor individual credit. Mr. Tzeuton raised this quandary with Ms. Allegra – including the precise reason they needed her help – and asked her to guaranty the purchase. Despite her fore-knowledge, Ms. Allegra accepted the responsibility and guaranteed the lease on July 25, 2007. When Kingdom defaulted and failed to return the copier, TimePayment obtained a judgment against Ms. Allegra for $19,062.55 plus interest and attorneys fees.

Ultimately, state court litigation was filed by the Plaintiffs to remedy their losses and the Defendant filed his Petition. He did not list in his SOFA and Schedules either the copier, the debt he owed to Kingdom, or his ownership interest in that entity.

For his part, Mr. Ogbebor grudgingly gave a version of events very different from Ms. Allegra's. Insofar as the June 7th Meeting is concerned, he cast himself more as a spectator than

9

a participant or, to be sure, a leader — it was as if his connection was in name only. He denied

making any representations about either Kingdom or hoped for investments at that meeting and

instead claimed that the agenda was limited to a general discussion regarding Kingdom's future.

He also denied that he had any meaningful impact on, control over, or responsibility for,

Kingdom's dealings. On every material point, he deflected responsibility to one or more of his

accomplices. For example, when discussing Kingdom's bank accounts he stated:

> We had an accountant, Patrick, that we had the legal counsel. The
> only reason why I was there it was that because I had the real
> estate company and I will be able to bring business to the title
> company. And that was so, the details, the account, I didn't sign
> any of these checks. I didn't do any of these things. For the fact
> that I was made president does not mean that I was doing anything,
> had nothing to do with the accounts.

(Trial Tr. 100, Nov. 29, 2010).

At bottom, he was only willing to concede that he had been Kingdom's President, had

attended the June 7th Meeting and that Kingdom had ultimately failed. He also asserted that it

was Mr. Tzeuton who provided the Allegras with investment information and that whatever

specific information they had was given to them in advance of the June 7th Meeting.

The Court finds Ms. Allegra's detailed and straight forward testimony to be vastly more

reliable and convincing than the Defendant's general denials and finger pointing. While

testifying, he was frequently agitated and angry, as if offended by the process. While that may

be a reasonable reaction for someone who is wrongfully accused, the circumstances — including

his failure to tell Plaintiffs (a) that an earlier attempt to gain a license had been rejected due to he

and his accomplices personal financial weakness, (b) the officers' true intentions regarding the

Plaintiffs' money, and (c) how that money was actually spent soon after it was deposited — cry

out for answers that make sense. Yet, Mr. Ogbebor, Kingdom's President, was left to assert that

10

he had no responsibility to disclose either the pre-June 7th license rejection, he, and his accomplices, actual designs on the money solicited at the June 7th Meeting, or its lightning fast dissipation once it was in hand.  By contrast, Ms. Allegra's testimony made sense from beginning to end and was unruffled by any contradictory facts.

It strains credulity to accept the notion that the Plaintiffs would have invested in Kingdom had they been told that the Defendant and his colleagues intended to spend their money as if it was lottery proceeds.  It is likewise impossible to believe that the Defendant did not have advance knowledge of the undisclosed, but intended, plans for that money.  At the close of the evidence, the Court was left with a definite and firm conviction that there never was an honest intention on the part of the Defendant and his colleagues to form a title company.  The transactions complained of by the Plaintiffs have all the earmarks of a crude fraud scheme, carried out solely to separate the Plaintiffs (and others) from substantial sums of money that were then frittered away.  To describe Kingdom as a legitimate business enterprise as it relates to the Plaintiffs, is to disregard both the truth and consequences of the Defendants' actions.

## IV.     **Jurisdiction and Venue**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§1334, 157 and Local Rule 402 of the United States District Court for the District of Maryland.  Venue is likewise proper under 28 U.S.C. §1409(a).

## V.     **Legal Analysis**

The Allegras rely upon Sections 523(a)(2)(A) and 523(a)(4) as the bases for asserting that the money they invested should be excepted from the Defendants' discharge. A plaintiff's case must satisfy five elements in order to prevail under Section 523(a)(2)(A).  *Grogan v. Garner*, 498 U.S. 279, 287-288 (1991)*; In re Rountree,* 478 F.3d 215, 218 (4th Cir. 2007); *Dubois v.*

11

*Lindsley (In re Lindsley)*, 388 B.R. 661, 668 (Bankr. D. Md. 2008); *Guaranty Residential Lending, Inc. v. Koep (In re Koep),* 334 B.R. 364, 371-72 (Bankr. D. Md. 2005). Those elements are: (1) that the defendant made a representation; (2) that the defendant knew at the time the representation was made that it was false; (3) that the defendant made the representation with the intent and purpose of deceiving the plaintiff; (4) that the plaintiff justifiably relied upon the false representation; and (5) that the plaintiff suffered damages as a proximate result of the representation. *Lindsley*, 388 B.R. at 668; *Koep,* 334 B.R. at 371-72. The debtor's intent shall be determined subjectively with a totality of the relevant circumstances taken into account. *In re Rembert*, 141 F.3d 277, 281 (6th Cir. 1998); *In re Pleasants*, 231 B.R. 893, 898 (Bankr. E. D. Va. 1999), aff'd, 219 F.3d 372 (4th Cir. 2000). The standard of reliance is justifiable, as opposed to reasonable, and that element is also to be assessed in accordance with the overall circumstances of the case. *Field v. Mans*, 516 U.S. 59, 73 (1995); *Colombo Bank v. Sharp (In re Sharp)*, 340 Fed. Appx. 899, 905, 2009 WL 2480841 (4th Cir. 2009).

Section 523(a)(4) provides an exemption from discharge for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. §523(a)(4). The threshold question under this subsection is whether the debtor was in a pre-existing fiduciary relationship with the creditor at the time the transactions occurred. The answer is governed by federal law, *Zohlman v. Zoldan (In re Zoldan)*, 226 B.R. 767, 772 (S.D. N.Y. 1998); *In re Heilman*, 241 B.R. 137, 158 (Bankr. D. Md. 1999), and federal law mandates that an express, or, technical trust must underpin the fiduciary relationship in order for it to be actionable. *Chapman v. Forsyth*, 43 U.S. 202, 208 (1844) (holding that a factor was not acting in a fiduciary capacity for the purposes of denial of discharge); *Heilman,* 241 B.R. at 159-162. While state law is relevant, not all state law fiduciary relationships rise to the level requisite to except the debt from discharge.

*Chapman*, 43 U.S. at 208. ("If the act embrace [a debt owed by a factor], it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate."). Moreover, as the Supreme Court held in *Davis v Aetna Acceptance Co.,* 293 U.S. 328, 333 (1934), the fiduciary relationship cannot arise from the alleged wrongdoing. It must exist prior to the act. *Id.* ("It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*. He must have been a trustee before the wrong and without reference thereto.").

Finally, Section 727(a)(4)(A) provides for denial of discharge when "the debtor knowingly and fraudulently, in or in connection with the case (A) made a false oath or account." 11 U.S.C. §727(a)(4).[9] As stated in *Williamson v Fireman's Fund Ins. Co.,* 828 F.2d 249, 251 (4th Cir. 1987), "[i]n order to be denied a discharge under this section, the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud. The false oath made by the debtor must have related to a material matter." (internal citations omitted).

In all exceptions to, and denial of, discharge cases, a creditor must prove their allegations by a preponderance of the evidence, *Grogan,* 498 U.S. at 287, 291, and all exceptions to

---

[9] As indicated previously, the Complaint sought denial of the Debtor's discharge under Section 727(a)(12). That Section authorizes a denial of discharge in cases where Section 522(q)(1) applies. However, Section 522(q)(1) only applies in precise, limited circumstances and none of them are present here. 11 U.S.C. §522(q)(1). Nevertheless, the Plaintiffs tried their case as if they were seeking a denial of discharge under Section 727(a)(4) (no evidence relevant to Section 727(a)(12) was offered) and counsel for the Defendant did not object for a failure to properly plead. Instead, he conducted cross-examination over the same terrain. Hence, the analysis will proceed as if the Section 727(a)(4)(A) cause of action was properly pled. See Fed. R. Civ. P. 15(b)(2), incorporated into Fed. R. Bankr. P. 7015; *Douglas v. Kosinski (In re Kosinski*), 424 B.R. 599, 614 (1st Cir. B.A.P. 2010) ("Consent to the trial of an issue may be implied if, during the trial, a party acquiesces in the introduction of evidence which is relevant only to that issue." (internal citations omitted)).

13

discharge are strictly construed against the creditor.  *In re McNallen*, 62 F.3d 619, 625 (4th Cir.

1995);  *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir. 1988).  This high evidentiary threshold

is meant to "protect the purpose of providing debtors a fresh start."  *In re Rountree,* 478 F.3d at

219.

> (a)     *The Debt Created by the Allegras Payment of Money to Kingdom for Investment Purposes with the Intent that they would Thereby Become Members of Kingdom Shall be Excepted from the Defendant's Discharge.*

Mr. Ogbebor made five material representations to the Allegras with respect to their

contemplated investment in Kingdom:

> 1)     the Allegras would receive an ownership interest in Kingdom at a cost of $5,000 per share;
>
> 2)     Kingdom's license was on the verge of approval;
>
> 3)     all that was necessary to secure license approval was the deposit of an adequate amount of cash security in an escrow account as proof of financial stability;
>
> 4)     the Allegra's money would be held in escrow for that purpose and would not be spent; and
>
> 5)     Kingdom's dealings would be completely transparent.

None of the five panned out.  However, the evidence must establish that Mr. Ogbebor

knew of their falsity and made them with an intent to deceive the plaintiffs at the June 7th

Meeting.  The second and third numbered representations – that Kingdom's license was "on the

verge of approval" and approval was solely dependent upon the presence of "an adequate amount

of cash security" – are both representations of an existing state of affairs that were either true or

false at the time they were made.  Ms. Allegra testified that she and her husband later learned

that the Defendant and his cohorts had already been rejected as licensees, a fact not revealed at

the June 7th Meeting.  While there was no proof beyond testimony that either a license was

actually being applied for at the time of the June 7th Meeting, or of any conditions for its approval, the fact that rejection had already occurred would have been relevant to whether approval could have been secured on a second attempt and hence material to the Allegras' decision. *Lindsley*, 388 B.R. at 669 ("An omission may constitute a misrepresentation where the circumstances are such that a failure to speak creates a false impression."). The Court finds that, at a minimum, the Defendant should have told the Allegras at the June 7th Meeting that he and his accomplices had already been rejected as licensees. But that alone does not compel the conclusion that the second and third representations were false; i.e., that at the time of the June 7th Meeting, there was no pending license application, that Kingdom's license was not "on the verge of approval" or that the existence of cash security would have won the quest.

Nevertheless, the Court concludes there never was a legitimate, ongoing effort to commence a title business (at least insofar as the June 7th Meeting was concerned) and that the June 7th Meeting was no more than a ruse calculated to gain the Allegras' trust and separate them from their money. That conclusion is reached mainly because of the utter falsity of the remaining representations. While each can technically be described as a statement regarding future conduct, and hence actionable only if the debtor did not intend to perform as promised at the time they were made, *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997), the Court is convinced that was precisely the Defendant's mind set.

The Defendant denied making any of the representations and hence did not speak directly to his intent at the crucial moment. But that is not a roadblock to justice. His intent can be readily inferred from circumstantial evidence and his course of conduct. See *In re Devers*, 759 F.2d 751, 753-54 (9th Cir. 1985) ("…fraudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct."). The Allegras were never given

15

any formal documentation memorializing their ownership interests, notwithstanding their repeated demands. At one point, they were given an unsigned paper dated October 12, 2007 that indicated they owned a nine per cent (9%) interest in Trinity. At best, that was a stalling tactic. If the Mr. Ogbebor truly intended the Allegras to receive an interest in Kingdom in exchange for their money, then he, as President of Kingdom, should have instigated appropriate action to memorialize the consideration due. Instead, when the Allegras demanded proof of their interest they were greeted with excuses and delay.

The Defendant's course of conduct, in combination with that of his cohorts, establishes that there never was any intention to hold the Allegra's money as promised; he offered no plausible rebuttal to the facts underlying the Allegra's reasonable expectation that their money would be held in escrow for a singular purpose. The bank records establish that the Allegra's money was doled out for a variety of undisclosed purposes almost as soon as it was deposited. As of the June 7th Meeting, the combined balance of Kingdom's four accounts was one hundred dollars, with twenty-five dollars in each. Pl.'s Ex. 13. The Allegra's checks were deposited on June 22, 2007. On July 2, 2007, ten days later, $5,000.00 was transferred to Kingdom's operating account.[10] Thereafter, the rest of the Allegra's money was drained from the savings and operating accounts in the manner previously described. Not only was the money not held sacrosanct, a significant portion of it was converted in a manner that was virtually criminal.

The final representation was that Kingdom's relevant operations would be transparent. In light of the misrepresentations noted above, including the post-investment spending spree, and the Defendant's evasion of the Plaintiffs' reasonable requests for proof of their interest, and then

---

[10] Prior to the transfer, several checks drawn on the account had been returned unpaid.

a meeting when their apprehension increased, the Court concludes that the Defendant had no intention of behaving transparently.

While there was no 'direct evidence' of Defendant's state of mind, "much of a determination concerning fraudulent intent depends largely on the assessment of the credibility and demeanor of the debtor." *Palmacci*, 121 F.3d at 785, quoting *In re Burgess*, 955F.2d 134, 137 (1st Cir. 1992). The entire premise upon which the Allegras decided to invest was upended almost the instant the Defendant and his colleagues got their hands on the money. It would be impossible to conclude that Mr. Ogbebor did not know what was planned at the time he made the contrary representations to the Allegras, especially since a significant portion of the money went directly to him. It is inconceivable that the Plaintiffs would have intended to make a gift of $45,000 to virtual strangers to be frittered away on all manner of expenditures including cash payments to those strangers. The Defendant must have intended to deceive them and the Allegras would not have parted with their money had they known his true intention. Having found the Allegra's version of events to be true, a finding of an intent to deceive on the part of the Defendant is inevitable.

The Court further finds that the Allegras justifiably relied upon the Defendant's representations when they invested their $45,000. The Defendant's description of why Kingdom needed the money and what would be done with it ─ all within the context of illusory Christian fellowship ─ established the prime motivation for the Allegras' decision. Mr. Tzeuton's subsequent phone call does not change the equation. While he was obviously dishonest too, the second payment finds its genesis in the Defendant's original fraudulent sales pitch.

Defendant contends that reliance was not justified because the Plaintiffs were well-educated. Holding their intelligence against them would impose a higher standard than the one

mandated by the Supreme Court in *Field v. Mans*, 516 U.S. 59 (1995). There the court stated, "a person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation." *Id.* at 70. Justifiable reliance requires neither investigation nor compliance with a "reasonable person" standard. See *Id.* There were no clues buried in the statements themselves to indicate they were patently false. Likewise, no 'red flags' were unfurled. This is especially so in light of the overall context and how the Defendant used it to take advantage of the circumstances. The Plaintiffs were drawn into the web of fraud by their attorney, Mr. Tzeuton. Their trust in him was the set-up. But once they were at the June 7th Meeting, the Defendant took over. His 'Christian Values' sales pitch created exactly the comfort level intended. Then he made the misrepresentations. All of this led to the desired result and the loss of $45,000 by the Allegras. Their reliance was justified. Finally, Plaintiffs' reliance on Defendant's false representations directly resulted in the loss of $45,000. Plaintiffs have established the elements 11 U.S.C. § 523(a)(2)(A) in a clear and convincing manner and that debt shall be excepted from the Defendant's discharge.

Ms. Allegra's decision to guaranty the copier lease, however, does not fall within the ambit of Section 523(a)(2). This is so for two reasons. Unlike the earlier transactions there was neither a promise of ownership nor of holding money in trust. Mr. Tzeuton informed Ms. Allegra that he and his colleague's credit was not good enough for the prospective creditor to approve the lease transaction and there is no evidence that he concealed or misrepresented material information. Yet, Ms. Allegra still made the decision to guarantee the lease. Moreover, even if some misrepresentation had been made, it was not the Defendant who made it. As there was no evidence of a fraudulent misrepresentation attributable to the Defendant, there can be no liability for this transaction. Accordingly, that claim for relief shall be dismissed.

(b)     *The Facts do not Support a Finding of a Pre-existing Trust Relationship and hence there is no Claim for Relief Under Section 523(a)(4).*

As indicated above, a cognizable fiduciary relationship must exist prior to the act complained of in order for a Section 523(a)(4) action to be sustained. *Davis,* 293 U.S. at 333. The wrongful act cannot form the foundation of that relationship. *Id.* However, that is precisely what happened with respect to Mr. Ogbebor's fraudulent solicitation of the $45,000 investment. If a fiduciary relationship was created, it did not exist prior to the payment of that money. Therefore, the cause of action is barred by *Davis's* express limitation.

As for the copier lease, no evidence or legal argument has been offered that explains why the Defendant violated a fiduciary duty owed Ms. Allegra regarding the lease default. Mr. Tzeuton asked her to guarantee the lease because none of Kingdom's principals had reliable personal credit. She decided to do so and the Court can see no connection between that transaction and the Defendant. The debt arising from the lease guarantee will not be excepted from the Defendant's discharge.

(c)     *While the Plaintiffs' Post-trial Amendment of the Complaint will be Allowed to Include a Section  727(a)(4) Claim, there was no Evidence that the Omissions were Fraudulent and hence the Claims shall be Dismissed.*

The Amended Complaint included the statement that, "Defendant did not list his interest in Kingdom Title, LLC and Kingdom Title and Escrow, LLC, neither did he disclose the proceeds from the same in his Chapter 7 bankruptcy petition," although Section 727(a)(4) was not cited. Plaintiffs, however, did elicit testimony regarding interests in property that Mr. Ogbebor failed to disclose in his SOFA and Schedules. The Defendant did not object to this line of testimony but instead attempted to counteract it during cross-examination. Yet, it was not until Plaintiffs filed their Post-Trial Memorandum (Dkt. No. 35) on April 29, 2011 that relief under Section 727(a)(4) was explicitly requested.

Plaintiffs argue that the discharge claim was tried with the implied consent of the parties under Federal Rule of Civil Procedure 15(b)(2), incorporated into Bankruptcy Rule 7015.  The Rule states in pertinent part:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move—at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2).

Implied consent can be found where the opposing party had a fair opportunity to defend and did not object when the issue was presented and argued.  See *In re Prescott*, 805 F.2d 719 (7th Cir. 1986) ("The test for consent is whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment.  One sign of implied consent is that issues not raised by the pleadings are presented and argued without proper objection by opposing counsel." (internal citations omitted)).

Although the relevant law was mis-identified in the Complaint, the facts alleged announced the Plaintiffs' real objective.  The Defendant was examined at length during trial, without objection, regarding the filing and content of the Petition, SOFA and Schedules and other initial documentation.  His counsel asked several questions on cross-examination geared to confirm that the Defendant had filed *pro se*, in the face of imminent foreclosure, to demonstrate a hurried, unsophisticated process and hence a lack of fraudulent intent.  The Court therefore concludes that the Defendant impliedly consented to the amendment of the Complaint to include a claim for relief under Section 727(a)(4).

The Defendant will not be prejudiced by that conclusion. Relief under this section requires a showing that the Defendant acted knowingly and *fraudulently* in making a false oath. *Williamson*, 828 F.2d at 251. There was no evidence of fraudulent intent in this context. In addition to the unrebutted facts posited by the Defendant, there was no evidence that the information left from his Schedules was omitted for fraudulent purposes or even that it was material. The Defendant's interest in Kingdom was worthless. The fact that he owed Kingdom money was equally meaningless to the bankruptcy estate. And his alleged possession of the copier may have had an impact on the amount of the TimePayment claim against Ms. Allegra but it would not have a bearing on the case. There has been no proof of fraudulent intent and no harm to the estate. Therefore, the Court finds that his discharge cannot be denied under Section 727(a)(4).

**VI.    Conclusion**

The $45,000 debt owed to the Plaintiffs will be excepted from Defendant's discharge. All other claims for relief are denied. A judgment memorializing these finding will issue simultaneously with this Opinion.

**End of Opinion**